IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

UNITED STATES OF AMERICA

v.                                                                    CRIMINAL ACTION NO. 3:05-00174

CABELL JOE PATMON

**MEMORANDUM OPINION**

On October 25, 2005, this Court granted defendant's motion to suppress certain statements he made to government agents on March 8, 2005. The defendant sought to suppress the following statements: (1) his response to a question by an agent that he had a gun in the basement which he bought for his protection after his house was broken into; and (2) his offer to retrieve the gun, and when not permitted to do so, his request that Ms. McFann do so. The following provides the support for the Court's granting of the motion.

**I. Background Facts**

The facts involving this motion are largely undisputed. On March 8, 2005, Special Agent (SA) E.H. Kennedy of the Drug Enforcement Administration and Officer Minor of the Huntington Task Force went to defendant's residence to execute an arrest warrant on defendant. The main door was open and through the glass door SA Kennedy could see a man working on an electrical outlet, a small child, and an adult female in the living room. SA Kennedy knocked on the glass door, the child approached the door, and he asked the child if Joe was home. The child walked down the stairs and returned with the defendant. SA Kennedy informed the defendant that he and Officer Minor were law enforcement officers and asked defendant if they could talk to him. Defendant allowed the officers into the residence. Once inside, the officers asked if they

could go speak with defendant in a more private setting away from the other individuals in the living room.  Because of this request, defendant escorted the officers to a bedroom.

Once inside the bedroom, SA Kennedy saw a bed and night stand.  Upon seeing the bed and night stand, SA Kennedy asked defendant if there were any guns or weapons in the house. Defendant told the officers that there was a gun in the basement that he had purchased for protection because his house had been broken into.  He then offered to retrieve the gun for the officers, and when he was not permitted to, he requested that Miss McFann retrieve the gun. Another officer who had arrived at the residence during these initial interactions went with Miss McFann and the gun was retrieved from the basement closet where the defendant said it would be.

While the gun was being retrieved, SA Kennedy advised defendant that they had an arrest warrant and asked if he wanted to cooperate.  After the defendant refused to cooperate, SA Kennedy left the room and shortly thereafter the arrest warrant was executed.  SA Kennedy who testified at a hearing on these motions could not give a precise time frame for these events, noting only that they occurred briefly.[1]  For the purposes of this motion, it is sufficient to note that the events transpired in increments of minutes.

The defendant essentially argues that the statements were made in response to questions that violated his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).  In response, the government claims that the agent's question regarding any weapons or guns in the house falls

---

[1]Agent Kennedy first testified that it was 20-25 minutes total from the time he arrived at the residence to the time he left.  Tr. at 17.  He further testified that the time from when the officers entered the residence to the time when the defendant was arrested was 10-15 minutes.  Tr. at 18.  Still later in the hearing, Agent Kennedy testified that this period may have been much briefer, more around 2-3 minutes.  Tr. at 29.

within the "public safety" exception to the *Miranda* requirements as carved out by the Supreme Court in *New York v. Quarles*, 467 U.S. 649 (1984). The government claims that when defendant led the officers into the bedroom which contained a bed and a night stand, the officers could establish for officer safety whether any weapons were in the house.

## II.  Applicable Law

As an initial matter, the court notes that the government does not dispute the fact that defendant was in custody at the time that SA Kennedy asked defendant whether any weapons were in the house. The *Miranda* protections only become relevant when a person is in custody. *See Miranda*, 384 U.S. at 444. The government's claim that the agent's questioning falls into an exception to *Miranda* implicitly acknowledges that defendant was in custody for purposes of *Miranda* protections.[2]

The Supreme Court first recognized the "public safety" exception in the case *New York v. Quarles,* 467 U.S. 649 (1984). In that case, a young woman told two police officers that she had just been raped and that the assailant had entered a nearby store, carrying a gun. *Id.* at 651-652. The officers spotted the defendant-suspect in the store, chased him down and searched him. *Id.* at 652. Upon finding an empty holster, the officers asked the defendant where the gun was located prior to giving him the *Miranda* warnings. *Id.* The defendant told them where the gun was in the store. *Id.* The Court held that officers may ask *pre-Miranda* questions when there exists "an objectively reasonable need to protect the police or the public from any immediate danger associated with [a] weapon." *Id.* at 659 n.8. In support for the narrow exception in this case, the

---

[2] Even had the Government contested this fact, the totality of the circumstances establish a custodial setting.

Supreme Court noted that the officer did not need to ask his question simply to elicit testimonial evidence, the kind of evil *Miranda* protected against, but rather the officer needed to insure that further damage to the public did not result from concealment of the gun. *Id.* at 657.

In applying the "public safety" exception, courts after *Quarles* maintain the narrowness of the exception and engage in fact intensive inquiry. In *United States v. Mobley*, the Fourth Circuit first recognized the "public safety" exception. 40 F.3d 688 (4th Cir. 1994). In that case, officers arrived at the defendant's house to execute an arrest and search warrant. *Id.* at 690. The defendant answered the door while naked, he was secured by agents while a security sweep was made, and the officers determined that defendant was alone in the house apparently unarmed. *Id.* He was advised that he was under arrest and was read his *Miranda* rights which defendant did invoke. *Id.* As defendant was being led away from the residence, officers asked if there was anything in the apartment which could be dangerous to the officers conducting the search warrant. *Id.* at 691. The defendant led the agents to a weapon in his bedroom closet. *Id.*

The Fourth Circuit addressed an initial issue holding that the "public safety" exception would apply to questions after post-*Miranda* protections were invoked to the same extent that it would apply to the *Quarles* situation involving pre-*Miranda* protections. *Id.* at 692-693. In holding that there were no "circumstances posing an objective danger to the public or police," the court noted that the facts in this case "contrast sharply to those of *Quarles*." *Id.* at 693. Defendant was encountered naked, a security sweep had been done, and he was the only person present in the residence. *Id.* The officers provided the court with no "extraordinary circumstances" which prompted the question about the weapon, and "[t]here is nothing that separates these facts from those of an ordinary and routine arrest scenario." *Id.* The Fourth

Circuit specifically noted that "[a]bsent other information, a suspicion that weapons are present in a particular setting is not enough...to demonstrate an objectively reasonable concern for immediate danger to police..." *Id.* at 693 n.2.

Several district courts have followed the *Mobley* analysis. In applying the "public safety" exception, the Eastern District of Virginia did not suppress an affirmative response to a question by an officer during the execution of a search warrant as to whether defendant had any "sharp objects, knives, needles, or guns." *United States v. Young*, 186 F.Supp.2d 642, 646 (E.D.Va. 2002), *aff'd* 58 Fed. App'x 980, 981-982 (4th Cir. 2003) (unpublished). Unlike the situation in *Mobley*, the premises had not been secured yet even though defendant was in handcuffs. *Id.* at 644. The question was asked as the officer began frisking the defendant. *Id.* Also, the police officers were aware of the defendant's criminal record which indicated he had been arrested for kidnapping, assault and harassment. *Id.* Further, the officer asked about weapons immediately upon securing the defendant and within seconds of entering. *Id.* at 646.

Another district has also applied this exception in denying suppression of a statement by defendant acknowledging ownership of a gun as he handed it over to the police officer. *United States v. Reynolds*, 334 F.Supp.2d 909 (W.D.Va. 2004). In response to a call about a shooting, the police arrived at defendant's residence where they found the defendant's girlfriend lying on the floor with a gunshot wound and found numerous bullet holes in the residence. *Id.* at 911. They also found one gun on a table next to the front door. *Id.* The shooter was at large and a small child remained in the house. *Id.* About ten to fifteen minutes after arrival on the scene, an officer asked defendant if he knew of additional weapons in response to which defendant handed a gun from his pocket and indicated some knowledge of the gun. *Id.* Officers then learned from

the dispatcher that he had a felony conviction and seized the gun. Even though the officers had been at the scene for 10-15 minutes before asking defendant if there were any other weapons in the residence, the court found under these circumstances that officers had an objectively reasonable concern about immediate danger to the officers and the child should a shooting resume. *Id.* at 913.

Another district court relying upon the reasoning in *Mobley* found that the "public safety" exception was not warranted based on the following factual circumstances: the defendant was alone when arrested; agents were surrounding him; there was no evidence that the agents knew defendant was carrying a weapon or had access to one; and there was no evidence that the arresting agents were aware of defendant's prior use of a firearm in the case. *United States v. DeSumma*, 44 F.Supp.2d 700, 704-705 (E.D.Pa. 1999). Citing to *Mobley*, the court found that this was "an ordinary and routine arrest scenario." *Id.* at 705.

### III. Discussion

The government claims that SA Kennedy's question was reasonable for officer safety pursuant to *Quarles* when the officers and the defendant entered a room where defendant had access to a bed and a night stand. However, the facts of this case vary greatly from *Quarles* which sets the standard for this narrow exception. Here, the defendant was not being pursued or identified as a person who had just committed a crime and was carrying a gun. *See Quarles*, *supra*. Although the defendant had not been handcuffed or frisked and a protective sweep had not been conducted, *see Mobley, supra; Young*, *supra*, the government provides no evidence that the officers had an objectively reasonable belief that defendant was carrying a weapon or had access to one. *DeSumma*, *supra*. Unlike the criminal record check conducted by the officers in

*Young*, SA Kennedy did not testify that he knew of any criminal history of defendant which raised any concern for officer safety as he and Officer Minor went to execute the arrest.[3]

Furthermore, the officers in both *Mobley* and *Young* were executing a search warrant. The officer asking the question in those cases knew that other officers would be searching the premises and could possibly be harmed by undisclosed weapons. The difference in the outcome of those cases depended, in part, upon the facts that officers were about to frisk a defendant incident to arrest and had yet to conduct a protective sweep at the time of the question. In the present case, the officers were not at the house to execute a search warrant, and thus, had no concern that other officers searching throughout the house could be harmed.

Instead of immediately executing the arrest warrant, the officers asked to go inside the unfamiliar residence and asked to speak to defendant alone. These initial interactions took several minutes. SA Kennedy did not testify that during these interactions he felt threatened or concerned about an immediate danger. It was not until SA Kennedy saw the bed and night stand in the bedroom that he became concerned for officer safety. The Fourth Circuit has explicitly determined that "[a]bsent other information, a suspicion that weapons are present in a particular setting is not enough...to demonstrate an objectively reasonable concern for immediate danger to police...." *Mobley*, 40 F.3d at 693 n.2. Even assuming that suspicion was raised because defendant was walking towards the night stand as he entered the bedroom, and possibly gaining proximity to a weapon as the officer implied, these circumstances do not constitute an objectively reasonable basis for questioning the defendant.

---

[3]SA Kennedy testified only that he knew that defendant was a convicted felon. Tr. at 25-26. SA Kennedy did not testify that he aware what those previous convictions were nor did he suggest that this fact raised any particular concern.

-7-

Unlike the defendants in *Mobley* and *DeSumma* who were alone when the questioning occurred, defendant clearly was not alone in the house when the officers chose to enter. However, there is no evidence that these other occupants, a man fixing an electrical outlet, a woman sitting in the living room and a small child, caused the officers concern for their safety. In addition, at the time of the questions regarding weapons in the house, defendant was in a room with two officers. Several other officers were coming to the residence. These circumstances were created by the officers themselves and contribute to a conclusion that an objectively reasonable concern for officer safety did not exist in the residence.

Although it is not clear exactly how much time transpired, anywhere from two to fifteen minutes according to SA Kennedy's testimony, the interaction between the time that the officers arrived at the residence up until defendant was questioned was more than a few seconds as in *Quarles* or twenty seconds as in *Young*. Although the *Reynolds* court refused to suppress statements about the location of a gun during an interaction which lasted ten to fifteen minutes, that case exhibited the kind of extraordinary facts warranting the exception. *See Reynolds, supra*. Contrary to those extraordinary facts, the officers in this case came to defendant's house with a valid arrest warrant and not in response to a report of any disturbance involving a gun, nor was there a continuing threat of a possible shootout occurring at defendant's house. None of the justifications present in *Reynolds* permitting a longer delay for concern of officer safety at a scene are present in this case.

### IV. Conclusion

In this case, the government agents arrived at the defendant's residence for the purpose of executing an arrest warrant. Instead of immediately arresting defendant when he came to the door

and after identifying themselves as law enforcement officers, the officers asked if they could come into the residence to speak with defendant.  The only reason the officers entered the bedroom, the very area which caused them alarm, was because they requested to come into defendant's house and requested to speak in an area permitting more privacy.  SA Kennedy offered no particular reason as to why this bed and this night stand caused him concern over his and Officer Minor's safety.

The interactions between the officers and defendant prior to the questioning suggest nothing more than "an ordinary and routine arrest scenario."  *See Mobley*, 40 F.3d at 693.  It is understandable why arresting officers would want to ask questions about the location of possible weapons in an unfamiliar residence.  Officers in similar situations may want to ask about weapons for officer safety as a matter of routine.  However, incriminating responses by a defendant under custody cannot be used in court proceedings.  The government in this case provides no evidence beyond mere suspicion to support a conclusion that an objectively reasonable need arose to protect the government officers from an immediate danger as required by *Quarles*.  As such, the questions by SA Kennedy to the defendant, who was admittedly in custody, violated *Miranda* and suppression of the defendant's response is appropriate.

The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion to counsel and the defendant, the U.S. Attorney's Office, and the U.S. Probation Office.

              ENTER:     October 28, 2005

              ROBERT C. CHAMBERS
              UNITED STATES DISTRICT JUDGE